T.C. Summary Opinion 2017-57

UNITED STATES TAX COURT

GREGORY J. GOWEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21365-15S.                    Filed July 24, 2017.

<u>Mark L. Rhoades</u>, for petitioner.

<u>Arthur W. Peterson, III</u> and <u>Jason M. Kuratnick</u>, for respondent.

SUMMARY OPINION

JACOBS, <u>Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

After concessions,[1] the issues for decision are whether petitioner: (1) failed to report as income a taxable retirement distribution of $46,703 in 2012; (2) is liable for the 10% additional tax under section 72(t)(1) on early distributions from a qualified plan and; (3) is liable for the section 6662(a) accuracy-related penalty.[2]

All section references are to the Internal Revenue Code, as amended, in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

At the time he filed his petition, petitioner resided in New Jersey. Petitioner holds a master's degree in taxation and is a certified public accountant. He considers himself to be an expert in the field of income tax, having been employed by several large, international accounting firms, including Ernst & Young, PricewaterhouseCoopers, and KPMG.

On March 8, 2012, petitioner borrowed $50,000 from his KPMG section 401(k) retirement plan account administered by Merrill Lynch (a unit of Bank of

---

[1]Respondent concedes an issue raised in the notice of deficiency relating to petitioner's alleged failure to report a $183 retirement distribution from BNY Mellon.

[2]Respondent also made certain alternative minimum tax determinations that are purely computational.

America N.A.). The terms of the loan required petitioner to make 120 semimonthly payments of $451.72, beginning on March 30, 2012, and ending on March 15, 2017. Petitioner initially made the required payments, but after he lost his job at KPMG, he stopped making payments, beginning with a missed payment due on August 30, 2012. Merrill Lynch sent petitioner a notice dated October 23, 2012, stating: "Our records indicate that your loan payment is past due. Your loan is in danger of being defaulted." The notice also stated:

> We are required by law to enforce the provisions of the Promissory Note and Security Agreement for your loan dated 03/08/2012, to ensure the qualified status of the plan. If you default on the loan, the following action will be taken:
>
>> The unpaid balance and accrued interest on the balance will be reclassified as a withdrawal.
>>
>> The taxable portions of the withdrawal will be recorded as taxable income.
>>
>> The taxable portion of the withdrawal will be taxable to you in the year of the default. It will be subject to ordinary income tax, and if you are under the age of 59 ½ at the time of the default, it may also be subject to a 10% tax penalty.

The notice further stated that the cure or default period expired at the "end of the calendar quarter following the calendar quarter during which the payment was missed." Because the day of petitioner's first missed payment, August 30, 2012, was in the third calendar quarter of 2012, the cure or default period expired on

December 31, 2012, the last day of the fourth quarter of 2012. Merrill Lynch sent petitioner additional default notices on November 26 and December 26, 2012, repeating the default notifications and warning him of the tax consequences of default.

Shortly after the default expiration date, December 31, 2012, the deemed distribution was administratively processed, and Merrill Lynch, through Bank of America N.A., reported a distribution to petitioner of $46,703, representing the defaulted portion of his $50,000 loan, on Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., sent to both petitioner and the Internal Revenue Service. Petitioner's correct address was printed on the Form 1099-R; he maintains he never received it. Petitioner admits, however, that he received a distribution statement sent by Merrill Lynch, dated January 7, 2013, which reported the $46,703 deemed distribution.

In addition to the aforementioned deemed distribution, petitioner received two other distributions from his qualified retirement plan. On July 31, 2012, petitioner withdrew $36,000 from his KPMG section 401(k) retirement plan

account, and on November 13, 2012, he withdrew another $50,000 from that account. All told, petitioner received gross distributions from his KPMG section 401(k) retirement plan account of $132,703 in 2012.

Petitioner received an extension of time to file his Federal income tax return; even so he filed his Form 1040, U.S. Individual Income Tax Return, for 2012 late, on October 21, 2013. On his 2012 tax return petitioner reported income of $216,147 consisting of wages of $122,776, pensions and annuities of $86,000 (the total of the amounts he withdrew from his KPMG section 401(k) retirement plan account), and unemployment compensation of $7,371. Petitioner did not report the deemed distribution from Merrill Lynch, claiming that (1) he did not receive the Form 1099-R and (2) he believed that the distribution statement sent by Merrill Lynch indicated that the deemed distribution had occurred on January 7, 2013. Petitioner did not report any liability with respect to the section 72(t)(1) 10% additional tax on early retirement distributions even though he was 51 years old on December 31, 2012.

## Discussion

In an unreported income case, such as the instant matter, a presumption of correctness attaches to the Commissioner's determination after he provides a minimal evidentiary foundation. See Rule 142(a); United States v. McMullin, 948

F.2d 1188, 1192 (10th Cir. 1991); <u>Anastasato v. Commissioner</u>, 794 F.2d 884, 887

(3d Cir. 1986), <u>vacating and remanding on other grounds</u> T.C. Memo. 1985-101.[3]

Moreover, if an information return, such as a Form 1099-R, is the basis for the

Commissioner's determination of a deficiency, section 6201(d) may apply to shift

the burden of production to the Commissioner if in any court proceeding the

taxpayer asserts a reasonable dispute with respect to the income reported on the

information return and the taxpayer has fully cooperated with the Commissioner.

<u>See</u> <u>McQuatters v. Commissioner</u>, T.C. Memo. 1998-88.  Petitioner has not

challenged the accuracy of the information reported on the Form 1099-R.

We do not decide this case by reference to the placement of the burden of

proof.

I.      <u>Underreported Retirement Income Distribution</u>

A distribution from a qualified plan, such as petitioner's section 401(k)

retirement plan account, is generally includible in the income of the distributee in

the year of distribution.  Sec. 402(a).  If a participant or beneficiary of a qualified

plan receives a loan from the plan, that amount is generally treated as a taxable

---

[3]In certain circumstances the burden of proof with respect to factual matters may shift to the Commissioner.  Sec. 7491(a).  Petitioner does not argue that sec. 7491(a) applies herein, nor did he show that he met its requirements for shifting the burden of proof.

distribution in the year received. Sec. 72(p)(1)(A). However, loans are excepted from this general rule under section 72(p)(2) if certain requirements are met: (1) the outstanding loan does not exceed a statutorily defined maximum amount, sec. 72(p)(2)(A); (2) the loan is to be repaid within five years, unless it is a home loan, sec. 72(p)(2)(B); and (3) except as provided in regulations, the loan has substantially level amortization over the term of the loan with payments not less frequently than quarterly, sec. 72(p)(2)(C). In addition, section 1.72(p)-1, Q&A-3, Income Tax Regs., requires that the loan be "evidenced by a legally enforceable agreement".

The section 72(p)(2) exception ceases to apply when the "loan from a qualified employer plan no longer satisfies the requirement of section 72(p)(2)(C) * * * [because] the participant fails to make a loan payment either on the date that it is due or within the allowed grace period." Martinez v. Commissioner, T.C. Memo. 2016-182, at *8 (quoting Duncan v. Commissioner, T.C. Memo. 2005-171); accord sec. 1.72(p)-1, Q&A-4, Income Tax Regs. (explaining further that such a failure would result in a deemed distribution), Q&A-10(a) (providing that a plan administrator may allow a cure or grace period which cannot continue beyond the last day of the calendar quarter following the calendar quarter in which the required installment payment was due and that section 72(p)(2)(C) will not be

considered to have been violated if the installment payment is made not later than the end of the cure period). If the taxpayer fails to make the required loan payments, the amount of the deemed distribution is the amount that equals the outstanding balance of the loan (including accrued interest) at the time of failure. Sec. 1.72(p)-1, Q&A-10(b), Income Tax Regs.

The record herein demonstrates that petitioner borrowed $50,000 from his KPMG section 401(k) retirement plan account on March 8, 2012, and that he failed to make required payments beginning with the missed August 30, 2012, payment. Merrill Lynch sent petitioner multiple letters alerting him to the missed payments and warning him of the tax consequences if the missed payments were not made by the expiration of the cure period.

Petitioner concedes that the balance of the loan outstanding as of the expiration of the cure period is deemed to be a taxable distribution. However, petitioner maintains that the cure period expired in 2013 and thus the distribution is deemed a taxable event for that year, not for 2012 as respondent asserts. Petitioner maintains that the loan notices sent on October 23, November 26, and December 26, 2012, informed him "that your loan was 'in danger of being in default'" and that it was not until January 7, 2013, that Merrill Lynch issued him a distribution information statement reporting the deemed distribution from his

default.  Moreover, petitioner claims he never received a Form 1099-R reporting

the deemed distribution.  Petitioner posits:

> Treasury Regulation 1.72(B) [sic] does not mandate a maximum cure
> period.  Therefore, the plan administrator has ability to define the
> cure period which Petitioner was told by Merrill Lynch was six
> months.  Petitioner's reliance on the statement of Merrill Lynch was
> reasonable.  In addition, it was reasonable for Petitioner to rely on the
> communications from Merrill Lynch throughout 2012 that the loan
> was not yet in default, as well as the communication from Merrill
> Lynch that the loan was deemed a distribution on January 7, 2013.

Petitioner's position is not correct.  The applicable regulation does, in fact,

designate a "maximum cure period".  Section 1.72(p)-1, Q&A-10(a), Income Tax

Regs., provides:

> Failure to make any installment payment when due in accordance
> with the terms of the loan violates section 72(p)(2)(C) and,
> accordingly, results in a deemed distribution at the time of such
> failure.  However, the plan administrator may allow a cure period and
> section 72(p)(2)(C) will not be considered to have been violated if the
> installment payment is made not later than the end of the cure period,
> which period cannot continue beyond the last day of the calender
> quarter following the calendar quarter in which the required
> installment payment was due.

At trial petitioner maintained that this regulation, in fact, supported his contention.

In response to his counsel, Mark Rhoades, who asked him:  "[W]hat is your

understanding of the regulation as to when a distribution will be deemed a

distribution for a 401(k) loan, with regard to the counting quarters[?]", petitioner

stated:

> MR. GOWEN: Well, in terms of the distribution itself, my interpretation would be that the language of the calendar quarters should actually be viewed as quarters of a year, and therefore, it shouldn't be based upon the fact of when you lost your job.
>
> For instance, somebody was unemployed in June would actually get six months of cure period, versus somebody that would get laid off in August, as I was. That only gets four months of cure period.
>
> So it didn't seem to equate, and under the--you know, the statute that that made sense, that one individual would be treated differently, and that the calendar quarter was somehow magical in its intent of, you know, terminating the cure period.
>
> MR. RHODES: So to your understanding the first quarter--in your situation the first payment was missed in August, correct?
>
> MR. GOWEN: Correct.
>
> MR. RHODES: So the first quarter, in your understanding, was August, September, October?
>
> MR. GOWEN: Right.
>
> MR. RHODES: Then the second quarter would have been November, December, January; is that correct?
>
> MR. GOWEN: That's correct.

Petitioner ignores the plain language of the regulation in making his argument.

The regulation makes no mention of a six-month cure period. It merely provides

that the cure period cannot continue beyond the last day of the calendar quarter following the calendar quarter in which the required installment payment was due. Tellingly, section 1.72(p)-1, Q&A-10(c), Income Tax Regs., contains the following example:

> (i) On August 1, 2002, a participant has a nonforeitable account balance of $45,000 and borrows $20,000 from a plan to be repaid over 5 years in level monthly installments due at the end of each month. After making all monthly payments due through July 31, 2003, the participant fails to make the payment due on August 31, 2003 or any other monthly payments due thereafter. The plan administrator allows a threemonth [sic] cure period.
>
> (ii) As a result of the failure to satisfy the requirement that the loan be repaid in level installments pursuant to section 72(p)(2)(C), the participant has a deemed distribution on November 30, 2003, which is the last day of the three-month cure period for the August 31, 2003 installment. The amount of the deemed distribution is $17,157, which is the outstanding balance on the loan at November 30, 2003. Alternatively if the plan administrator had allowed a cure period through the end of the next calendar quarter, there would be a deemed distribution on December 31, 2003 equal to $17,282, which is the outstanding balance of the loan at December 31, 2003.

Petitioner, like the plan participant in the regulation example, failed to make the required loan payments in August, which is in the third calendar quarter. Petitioner's cure period, like the plan participant's cure period in the example, expired at the end of the fourth calendar quarter: December 31. Thus, petitioner, like the plan participant in the example, is deemed to have received a taxable

distribution as of December 31, 2012. The fact that Merrill Lynch issued petitioner a statement on January 7, 2013, documenting that a distribution had been made does not change this. The January 7, 2013, statement did not indicate when the distribution had occurred.

In sum, petitioner received a taxable retirement distribution of $46,703 in 2012.

## II.      Section 72(t)(1) 10% Additional Tax on Early Withdrawals

Amounts received by a taxpayer from a qualified plan are generally subject to a 10% additional tax on early distributions under section 72(t)(1) unless one of several exceptions set forth in section 72(t)(2) applies. Those exceptions include: (1) distributions made on or after the taxpayer attains age 59½; (2) distributions that are part of a series of substantially equal periodic payments over the life of the taxpayer; (3) distributions after separation from service after the taxpayer reaches age 55; (4) distributions made with respect to certain medical expenses; (5) distributions made to make payments pursuant to a qualified domestic relations order; and (6) certain employee stock option program distributions. See Arnold v. Commissioner, 111 T.C. 250, 255 (1998) ("The legislative purpose underlying the section 72(t) tax is that 'premature distributions from IRA's frustrate the intention

of saving for retirement, and section 72(t) discourages this from happening.'"

(quoting Dryer v. Commissioner, 106 T.C. 337, 340 (1996))).

Petitioner reported retirement distributions of $86,000, representing the July

and November distributions, on his 2012 Federal income tax return; he did not pay

the section 72(t)(1) 10% additional tax on that amount.  Furthermore, as we held

supra part I, petitioner received a $46,703 taxable retirement distribution on

December 31, 2012; he did not pay the section 72(t)(1) 10% additional tax on that

amount.

Petitioner has not established that he meets any of the exceptions

enumerated in section 72(t)(2).  Instead, petitioner asserts that he suffered

financial hardship during 2012 and therefore is not subject to the section 72(t)(1)

10% additional tax.  Petitioner points to section 1.401(k)-1(d)(3)(i), Income Tax

Regs., to support his position.  Section 1.401(k)-1(d)(1)(ii), Income Tax Regs.,

provides that a distribution made by a retirement plan is permitted in cases of "the

employee's hardship".  Section 1.401(k)-1(d)(3)(i), Income Tax Regs., provides:

> A distribution is treated as made after an employee's hardship for
> purposes of paragraph (d)(1)(ii) of this section if and only if it is
> made on account of the hardship.  For purposes of this rule, a
> distribution is made on account of hardship only if the distribution
> both is made on account of an immediate and heavy financial need of
> the employee and is necessary to satisfy the financial need.  The
> determination of the existence of an immediate and heavy financial

need and of the amount necessary to meet the need must be made in accordance with nondiscriminatory and objective standards set forth in the plan.

Petitioner asserts that "[a]s the regulation under section 401(k) allows all facts and circumstances to be considered", the definition of hardship should be broadly construed. Petitioner concludes that "he was unable to repay the 401(k) loan due to a combination of divorce and job loss, thus qualifying as a double financial hardship." Petitioner's position is flawed.

We do not doubt that petitioner endured financial hardship during 2012. But the regulation upon which petitioner relies is limited to authorizing qualified plans to make distributions to beneficiaries under certain circumstances, one of which occurs when a beneficiary incurs financial hardship. In other words, section 1.401(k)-1(d)(3)(i), Income Tax Regs., permitted the KPMG section 401(k) retirement plan to make the distributions to petitioner, but it did not provide for an exception to the 10% additional tax under section 72(t)(1). And as we stated in Arnold v. Commissioner, 111 T.C. at 255: "[N]o exception exists under section 72(t) for financial hardship." See also Duffy v. Commissioner, T.C. Memo. 1996-556; Pulliam v. Commissioner, T.C. Memo. 1996-354.

In sum, petitioner is liable for the section 72(t)(1) 10% additional tax on the $132,703 in distributions from his KPMG section 401(k) retirement plan account.

III.   Section 6662(a) Accuracy-Related Penalty

Respondent determined that petitioner was liable for a $5,876 accuracy-related penalty. Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax. An understatement of income tax is substantial for purposes of section 6662(b)(2) if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the section 6662(a) accuracy-related penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner has met his burden of production, the taxpayer bears the burden of establishing that an exception applies. Id. at 446-447.

The Commissioner has satisfied his burden of production with respect to petitioner's substantial understatement of income tax. Petitioner failed to report the $46,703 deemed distribution he received from his KPMG section 401(k) retirement plan account, and he failed to report and pay the section 72(t)(1) 10% additional tax. Petitioner reported a tax liability of $42,474 on his 2012 income

tax return. Respondent determined a deficiency of $29,465, but respondent conceded a minor amount of that deficiency. See supra note 1. We are satisfied that the understatement of tax exceeds 10% of the tax required to be shown on petitioner's 2012 income tax return, which will be greater than $5,000. Thus, the Commissioner has shown there is a substantial understatement of income tax.

A taxpayer may avoid liability for the accuracy-related penalty if he demonstrates that he had reasonable cause for the underpayment and acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner has made no argument with respect to the imposition of the section 6662(a) accuracy-related penalty. Petitioner holds a master's degree in taxation, is a certified public accountant, and has been employed by several large international public accounting firms. He did not consult any other tax professional when withdrawing money from his KPMG section 401(k) retirement plan account; he relied on his own expertise. Consequently, we sustain respondent's determination to impose the section 6662(a) accuracy-related penalty.

To reflect the foregoing, including respondent's concession,

<u>Decision will be entered</u>

<u>under Rule 155</u>.